241 So.2d 619 (1970)
SOUTHERN CHRISTIAN LEADERSHIP CONFERENCE, INC., et al.
v.
A.G. CORPORATION.
No. 45831.
Supreme Court of Mississippi.
October 12, 1970.
Rehearings Denied December 21, 1970.
Fred L. Banks, Jr., Constance Iona Slaughter, Jackson, Jonathon Shapiro, New York City, for appellants.
Pyles & Tucker, Jackson, for appellee.
ROBERTSON, Justice:
Appellee, A.G. Corporation, brought suit in the Chancery Court of Grenada County, Mississippi, against the Southern Christian Leadership Conference, Inc., a non-resident corporation, (hereafter SCLC), the B. and P. Enterprises, Inc., a corporation, and a large number of individual non-resident and resident defendants.
The appellee charged all the defendants with an illegal and unlawful conspiracy and with a secondary boycott "the malicious and unlawful object of which was to ruin and cause injury to the business of the complainant and others."
The appellee prayed for an attachment, temporary injunction, and damages for causing injuries to appellee's business.
A temporary injunction was authorized and issued and the case was tried on its merits by the Chancery Court of Grenada County from January 9, 1967, to February 15, 1967, with some breaks in the actual trial for the convenience of the litigants and the court.
The chancellor was very patient and allowed the parties to put on all the witnesses and develop all the evidence that the parties desired.
*620 The complete record, consisting of 3259 pages and filling 17 volumes, was carefully studied and considered by the chancellor before he rendered his 81-page opinion.
The chancellor found the Southern Christian Leadership Conference, Inc., a Georgia Corporation, the B. and P. Enterprises, Inc., a Mississippi Corporation, and thirty-nine individual defendants jointly and severally liable to the appellee for $114,572.95 damages.
Appellee had gone out of business so, the need for an injunction no longer existing, the temporary injunction was dissolved.
These forty-one appellants perfected their appeal to this court.
We affirm as to liability, but reverse and remand as to damages.
A.G. Corporation is a closely held Mississippi corporation, all of the stock being owned by Gilbert L. Allen, his wife, and their four children. Its sole asset was a small retail grocery business known at the time of suit as Pak 'N Sak. The corporation was organized in 1956, and its only place of business from 1956 until it went under in December, 1966, was located on Main Street, which bounds the public square of the city of Grenada on the east side. It was, therefore, located in the heart of the business district.
Appellee charged in its bill of complaint that:
"* * * beginning on or about July 5, 1966, and continuing daily thereafter each, every and all of the defendants, corporate, unincorporated associations and individual defendants, hereinbefore set forth, combined and entered into an agreement and conspiracy, with a unity of design and purpose and a preconceived plan, the malicious and unlawful object of which was to ruin and cause injury to the business of the complainant and others; that said defendants did not enter into said conspiracy and combination for the purpose of protecting or advancing any legitimate interests of their own; and that said act constituted an unlawful conspiracy.
"2. The complainant charges that the means employed by the defendants, and each of them in carrying out and to effect the purpose of the illegal and unlawful combination, plan, scheme and conspiracy, was and is likewise malicious, illegal and unlawful; that the defendants have since July 5, 1966, daily engaged in and committed malicious, illegal and unlawful acts of injurious falsehoods, deception, force, intimidation, threats, coercion and violence against the customers and prospective customers of the complainant.
"3. The complainant charges that in pursuance of the aforesaid conspiracy to injure the business of Complainant and others, that the defendants and each of them executed and are continuing to carry out said malicious, illegal and unlawful plan and scheme to his great damage; and that said conspiracy on the part of all and each of said defendants was induced in malice toward the complainant and was and is without justification or lawful purpose; and that its objects, as aforesaid, have been and are being accomplished by illegal means and in an unlawful manner.
"4. The complainant charges that on or about July 5, 1966, and daily thereafter the defendants and each of them entered into an unlawful combination among themselves and others who are unknown to Complainant to illegally bring about a secondary boycott to the business of the complainant and others with the intent and purpose of causing loss to the complainant and others by coercing the customers and prospective customers, against their will, to withdraw and withhold their beneficial business intercourse from the complainant by the infliction of physical injury to said customers and prospective customers *621 on their person and property; by the threat of physical injury; by intimidation so as to put said customers and prospective customers in fear of such injury; through the fear of incurring the displeasure, persecution and vengence of said combination, and by threats to said customers and prospective customers that unless they withdrew or withheld their beneficial business intercourse from the complainant and others against whom the conspiracy, combination and concert of action is directed, that said combination would cause injury to said customers in their person, property and business. Complainant further charges that by the use of threats, intimidation, and coercion, the said defendants intended to overcome and did overcome the will of customers and prospective customers of the complainant, and by such unlawful and illegal means, intended to and did compel said customers to refrain from trading with the complainant. Complainant further charges that said defendants committed acts and spoke words to said customers and prospective customers of complainant that caused them to fear for their lives and safety; and that they were in such apprehension of damage that said customers were and are so influenced thereby as to prevent them from freely trading with complainant as said customers so desire to do; and that the complainant asserts that it at no time material hereto had any dispute, disagreement or controversy with any of the defendants herein or the combination thereof. Complainant further charges that the said illegal secondary boycott was and is an unlawful invasion of his property rights; that complainant has been caused to suffer great harm and damage as a result thereof; and that complainant, because of said malicious attempt to irreparably injure it, without purpose, by said secondary boycott, is entitled to recover damages jointly and severally from said defendants." (Emphasis added).
The bill of complaint was filed on September 28, 1966, and the appellee went out of business on December 24, 1966.
The events immediately preceding the acts and actions of the defendants complained of were chronicled by the chancellor in his opinion, thusly:
"The `Meredith March,' publicized by Negro James F. Meredith as his march from Memphis to Jackson, for the purpose of emphasizing the importance of Negro voter registration, is a matter of common knowledge. It began in early June, 1966, and a matter of common knowledge, though not clearly reflected in the record, Meredith was fired upon and wounded in southern DeSoto County, when his march was very young. Defendants, in their Brief, saw that `In June, 1966 James Meredith, in cooperation with the SCLC, led a civil rights march through Grenada.' The Court accepts as accurate this statement that it was in cooperation with the SCLC. Nevertheless, the late Dr. Martin Luther King, otherwise identified in the record as President at all times of SCLC, arrived in Grenada with the march and made certain demands upon Grenada County officials, including extended and expanded opportunities to the Colored people of the County to be registered to vote. The march continued onward, but SCLC remained interested that agreements by Grenada County officials would be kept, would not be `reneged on,' as termed by one witness.
"For some time prior to the Meredith march, there existed a Ministerial Alliance in Grenada, whose membership included ministers of both races. The Colored members of it, about the end of June or early in July, 1966, resolved to organize what is called in the record the Grenada County Freedom Movement. It was and is an unincorporated, apparently loosely organized group of Negroes with kindred thoughts and ambitions for their betterment. It will be referred to usually herein as `GCFM'. Defendant the Reverend C.C. Coleman, then pastor of First New Hope Baptist *622 Church and President of the Ministerial Alliance, presided over the organizational meeting which was held in Defendant Vincent Chapel Church, and attended by other ministers and by certain SCLC employes or workers, as hereinafter to be shown. In the organization, the organizers defined its purpose as being the improvement of conditions in the Negro community, particularly in areas of voter registration, political education, and in use of public accommodations covered by the 1964 Civil Rights Act. Defendant the Reverend Sharper T. Cunningham, then Pastor of Bell Flowers Baptist Church, was named President and occupied that office at all times pertinent to this Opinion. Willie T. Savage was made Treasurer, and one Chambers was made Vice President, but he was shortly succeeded by Defendant the Reverend B.J. Cameron. Secretary was Miss Joanne Taylor.
"GCFM was described as having as its members all Negro citizens of Grenada County who were interested and participated and wish to be identified with it, but it was more boldly described as having for members all the Negroes of Grenada County. There are no dues, but its expenses are borne by contributions at meetings, and from throughout the country. Some of the defendants denied that they were members of GCFM.
"After its organization, there were mass meetings almost every night, and these were held in various Churches, including those named defendants in the Bill of Complaint. The responsible officers of the several Churches either affirmatively voted for their Church buildings to be so used, or acquiesced in such use. Bell Flowers Baptist Church, by affirmative approval of its responsible officers, became the headquarters for both SCLC and GCFM, and they maintained offices there, and picketing and marching generally emanated from there, until the Church edifice was damaged by fire.
"Following the departure of the Meredith march from Grenada, SCLC representatives and workers either stayed behind in Grenada, or immediately returned thereto, to press for compliance with understandings had by SCLC with Grenada County officials and to test public accommodations. One of these was Defendant James M. Bulloch. (See Bulloch v. State, Miss., 199, So.2d, 455, 1967). (sic) In his own testimony, he was shown to be a field worker of SCLC; he joined the Meredith march at Grenada June 14, 1966, where President Dr. King, Department of Citizenship Education Head Dr. Robert Green, Field Staff Superintendent and Department of Voter Registration and Political Education Head Hosea Williams, Executive Director Reverend Andrew Young, Field Staff workers Leon Hall, Herman Dozier, and Robert Simmes, all of SCLC, were, and remained with the march to the proximity of Greenwood, from whence he was, by SCLC, sent back to Grenada, and by Hosea Williams, assigned as a staff worker to continue voter registration in Grenada County. He was accompanied or preceded by Dozier and Simmes, mentioned next above.
"These three, Dozier and Simmes and Defendant Bulloch, assisted in the organization of GCFM, and Bulloch prepared an organizational chart for it, which, as far as he knew, was never adopted, and discussed with Defendants Cunningham, Cameron, and L.E. Smith, assistant pastor of Bell Flowers Church, the type of the organization. The record overwhelmingly established that SCLC closely cooperated with GCFM in the activities complained of in the Bill of Complaint, and actively assisted in carrying out these activities. In the boycott complained of, the record reflects that the strategic decisions were made by GCFM and the tactical decisions to be employed in carrying out the strategic decisions were usually made by SCLC, and the decisions were carried out by SCLC. The SCLC staff assisted in whatever GCFM was doing.
"The services of SCLC were made available to GCFM, which, in mass meeting, accepted *623 the offer by vote. In the language of Defendant Cunningham, GCFM President, `Well, they were to be at our disposal and to assist us in accomplishing our objectives.'"
Continuing to lay the background, the chancellor said:
"On the 10th day of July, 1966, Colored people marched to the Grenada County jail to protest the jailing of certain people of the Colored community, and Defendants' position is that Highway Patrolmen, the Sheriff and his Deputies, and City Police beset them and beat some of their number, dispersing them. Complainant, asserting and proving by a preponderance of the evidence that no officer, stockholder, or employe of it participated in any way in the occurrence, did not seriously controvert Defendants' testimony as to the occurrence.
"The demonstrators retreated into a mass meeting held on that night, and a boycott of white merchants was launched, set off largely, apparently, by the jail experience. The launching of it was variously described by Defendants who testified. The mass meeting seems definitely to have been a GCFM meeting. It was described as being a spontaneous decision of Grenada people in a mass meeting attended by several hundred people, and as a result of initiative from the people in Grenada. Some witnesses present at the meeting testified that SCLC Official Hosea Williams was speaking on the incident and asked the question, `What shall we do?' and everybody cheered and said, `Boycott!' and the boycott was on. Another account has it that Project Director Leon Hall was present and stated, `Since they beat us on Sunday, we will put on a boycott on Monday.'
"The record establishes that SCLC operatives Hosea Williams, Leon Hall, and J.T. Johnson, and perhaps Alphonzo Harris, urged the boycott, and that GCFM President Cunningham and Mrs. Beulah Washington and Defendant Robert Edward Johnson urged the boycott.
"Regardless of whether the people at the GCFM mass meeting or the GCFM or SCLC actually set off the boycott, it was launched and the record clearly supports the conclusion that SCLC and GCFM were in complete agreement on it and worked together for the achievement of complete success in it, and the record reveals that SCLC considered itself here to assist in what the Colored community wanted.
"The Court considers that SCLC's direct action program here reveals itself. SCLC furnished a man, Defendant R.B. Cottonreader, Jr., who would largely be in overall charge of picketing activities in connection with the boycott, and it furnished a man, Henry Brownlee, who was adept at making picket signs for the group. Defendant Major Wright helped from time to time with the picketing, as did others of SCLC."
The chancellor in stating what he believed to be the basic issue said:
"Complainant asserts and argues that Defendants entered into a conspiracy to hurt, damage, and put it out of business. The Court believes that existence or not of conspiracy is a basic, threshold issue, and should be resolved.
"In Mississippi Power and Light Company v. Town of Coldwater, 234 Miss., 615, 636, 106 So.2d, 375, 1958, the Supreme Court defined conspiracy:
"`A sufficient definition of conspiracy is "a combination of persons to accomplish an unlawful purpose or a lawful purpose unlawfully." 15 C.J.S. Conspiracy, Sec. 1, page 996. See also Secs. 8 and 10 thereof at pages 1003 and 1006-7.'
"And it added:
`* * * of course, it is not a fraud or unlawful to do what one has a legal right to do. State v. Wilde [Wilbe] Lumber Co., 217 Miss. 346, 64 So.2d 327.'"
The chancellor noted in his opinion that Federal District Judge Clayton had issued *624 a temporary injunction on July 22, 1966, in Cunningham, individually and on behalf of all those similarly situated, et al. v. Suggs Ingram, individually and in his capacity as Sheriff of Grenada County, Mississippi, et al, enjoining Sheriff Ingram and city officials from arresting, jailing, prosecuting or punishing "the plaintiffs or members of the class they represent while they are engaged in exercising rights guaranteed and protected by the First and Fourteenth Amendments to the United States Constitution in accordance with the terms of this temporary injunction."
District Judge Clayton defined and delineated in rather great detail the manner in which plaintiffs and the class they represented could parade, demonstrate, march, picket and otherwise assert their rights. In his order, Judge Clayton not only provided for the protection of the plaintiffs in the exercise of their rights, but also provided for the protection of the public and other citizens in the exercise of their personal and property rights.
The chancellor recognized the rights of these defendants to peacefully picket and march and demonstrate as long as they stayed within the limits and bounds so carefully and fairly outlined by Judge Clayton. Every member of this Court agrees with the chancellor and Judge Clayton that the defendants had the right to peacefully meet, picket, march and boycott to secure redress of their grievances and complaints specifically made against particular employers or businesses.
The defendants argued that they were only exercising rights vouchsafed to them by the First and Fourteenth Amendments to the United States Constitution and that they did abide by the order of the district judge.
The whole trouble in this case was that these defendants had no complaint or grievance or even gripe against the appellee. One of their assignments of error was:
"The court erred in holding that defendants had acted in concert against complainant for an unlawful purpose because:
"a) Defendants' right to boycott complainant for the purpose of protesting its racially discriminatory employment practices and other discriminatory treatment of Negroes is protected by the First and Fourteenth Amendments to the United States Constitution;" (Emphasis added).
But the truth of the matter was that no complaint of any kind, oral or written, was ever made by any of these defendants or by any employee or any customer to the appellee, its officers or agents.
The appellee was, in effect, an innocent bystander who ultimately became the innocent victim of this struggle for political and economic power. Appellee was especially vulnerable because two-thirds of its trade was with black customers. The defendants were very aware of this fact.
The chancellor found that the defendants had entered into an illegal and unlawful conspiracy for the illegal and unlawful purpose of ruining the business of appellee, that the means employed, namely, a secondary boycott, threats, intimidation, duress and force, were unlawful and illegal and were clearly outside the constitutional guaranties, and the bounds set by District Judge Clayton.
We said in Southern Bus Lines, Inc. v. Amalgamated Ass'n of Street, Electric Railway and Motor Coach Employees, et al, 205 Miss. 354, 38 So.2d 765 (1949):
"The use of force, violence, coercion, or intimidation to prevent employees from working for the employer against whom the strike is in operation, or to prevent other workmen from accepting employment from him, is not permissible and an injunction will be granted to prevent the commission of such acts, and it is immaterial that the strike is for a lawful purpose. It is not necessary that there should have been actual violence or physical assaults, but it is sufficient if *625 threats, abusive language, or other acts amounting to intimidation and depriving those against whom the acts were directed of the power to exercise their own will in determining whether or not they should work, were used. 43 C.J.S. Injunctions § 147(e), page 747.
* * * * * *
"Peaceful picketing is a lawful act. Mass picketing, which is the use of a large number of pickets, is not peaceable picketing, is illegal, and entitles the one being picketed to resort to equity and obtain an injunction. Lilly Dache, Inc. v. Rose, Sup., 28 N.Y.S.2d 303; Western Electric Company v. Western Electric Employees Ass'n, 137 N.J. Eq. 489, 45 A.2d 695; United States Electrical Motors, Inc. v. United Electrical Radio and Machine Workers, etc., Cal.Super., 166 P.2d 921; General Electric Company v. Peterson, Sup., 61 N.Y.S.2d 813.
"When any individual or organization under whatsoever name attempts to use force to gain his or her ends, they are attempting to usurp a governmental function. When a picket line becomes a picket fence, it is time for the government to act. Carnegie-Illinois Steel Corporation v. United Steelworkers of America, 353 Pa. 420, 45 A.2d 857." 205 Miss. at 374 and 376, 38 So.2d at 768 and 769. (Emphasis added).
The Fourteenth Amendment to the United States Constitution, among other things, specifically provides: "* * * nor shall any State deprive any person of life, liberty, or property, without due process of law * * *." (Emphasis added).
Surely this prohibition should apply with equal or greater force to private persons or organizations.
In condemning a conspiracy of private persons to destroy the business and livelihood of another, we said, in Southern Bus Lines, Inc. supra:
"Private persons cannot conspire to illegally destroy the business of another, and where two or more persons conspire together, the conspiracy makes the wrongful acts of each the joint acts of all of them. Globe & Rutgers Fire Ins. Co. v. Firemen's Fund Ins. Co. et al., 97 Miss. 148, 52 So. 454, 29 L.R.A.,N.S., 869; State ex rel. Rice v. Hasson Grocery Co., 177 Miss. 204, 170 So. 234, 107 A.L.R. 663." 205 Miss. at 375, 38 So.2d at 769. (Emphasis added).
Although this is not a res ipsa loquitur case, we can not avoid noting, as the chancellor probably did, that even though the appellee's business had been a profitable one for ten years before the boycott began, six months later the business had been destroyed. Surely this is strong circumstantial evidence of the effectiveness of the secondary boycott which was promoted, encouraged, guided, directed and executed by these forty-one defendants-appellants.
In proving conspiracy, this Court in Wagley v. Colonial Baking Company, et al, 208 Miss. 815, 45 So.2d 717 (1950), said:
"The law permits great latitude in the admission of circumstantial evidence tending to establish a conspiracy, and to connect those advising, encouraging, aiding, abetting, and ratifying the overt acts committed for the purpose of carrying into effect the objects of the conspiracy, as the jury should have before them and are entitled to consider every fact which has a bearing on and a tendency to prove the ultimate fact in issue and which will enable them to come to a satisfactory conclusion." 208 Miss. at 856, 45 So.2d at 725.
The Chancellor, in specifically finding that illegal means were used, said:
"The Court returns to a review of the evidence and the application of these legal principles above. The pickets, operating all days some days, parts of days at other times, led by a leader, Defendant Cottonreader or another, sang, `hollered', made loud noises in the square, Defendant Cottonreader voiced hatred *626 of whites as he led the pickets in the Square, then walked back and forth in front of AG, and when a customer would vacate the store, he would have a conversation with him; mass picketing, they blocked the store entrance and customers could not go in and out; once when entreated to move on and not block the way, they sat down in the sidewalk, making their obstacle even worse; they carried signs conveying the message to AG, `Pak 'N Sak, pack up and sack out,' and other signs warning of danger downtown, and `Your days are numbered'; Cottonreader intercepted and led away a young lady about to pay a bill in the store. Soon after the school incident, a large mob of pickets, with newsmen accompanying them, stretched out over a half block, blocking entrance into AG's store for fifteen or twenty minutes, as they passed, and this occurred two or three times. These are some of the activities of the pickets, and the picketing was augmented by, and punctuated with, speeches in the public square, with boasts, threats, in which AG was the principal target, and condemnation of `Uncle Toms.' Then there were J.D. Willis, uncontradicted, and Defendant Wonzo Bowdry, contradicted, and the car with the CB radio, Willis, in particular, standing often at AG's front door talking to, and succeeding in getting Colored customers to turn away from AG. There was the contradictory testimony about Defendant Ward and the Colored girl with the turnip greens."
The chancellor also found that for a short time pictures were taken of black customers of the appellee, that the name of the customer was added to each picture, and the pictures were then posted at the Bell Flowers Church where the mass meetings were being held nightly, so that pressure could be brought to bear on those guilty of shopping with the appellee.
After extensive and detailed findings of fact, the trial court stated its conclusions of law:
"The Court concludes that the boycott was not conducted within peaceful and legal limits, that the picketing and other admissible incidents exceeded free speech rights of the Constitution, and that, what the Court has hereinbefore found to be the agreement, the means to the end, of the boycotter Defendants, does in fact amount to a conspiracy, and that one of the conspiracy's goals was to injure AG in its business or to force it out of business. The record, almost without contradiction, demonstrates that the activity of the Defendants caused terror and fright among the Colored community, and the Court cannot from the testimony conclude that that was unintended on the part of the conspirators. Thus, returning to the Southern Bus Lines case, there was coercion or intimidation (both are not necessary to be present) to prevent, and prevented, shoppers from patronizing AG."
Before ruling on these findings of fact and conclusions of law of the chancery judge, we must remind ourselves of the constitutional limits placed on judicial review by a court of appeals.
Chancellor, then Associate Justice, then Chief Justice V.A. Griffith, in his monumental work on Mississippi Chancery Practice, (Second Edition, 1950), Section 674, Pages 741-743, carefully, thoughtfully and logically explains the limited scope of appellate review:
"Our constitutions having thus ordained that the appellate court shall have no original jurisdiction, that jurisdiction has been, by these constitutions, vested exclusively in the circuit and chancery courts, save only as to inferior or petty causes. It is a consequence of this fundamental policy in the distribution of judicial authority that the judgments and decrees of the circuit and chancery courts shall have conclusive force and effect, in the absence of material error of law or error of fact so manifest as to become error *627 of law. It is a matter of constitutional right to all parties litigant to have their issues of fact submitted to and passed upon by the jury or chancellor, according to the ordinary practices of the forum in which a case is for trial; and it is a matter of constitutional right that the successful party there shall not have his cause reviewed except upon the record as there made, and that the findings of fact as there determined shall not be reversed unless clearly shown to be erroneous. It has therefore been the uniform rule that the chancellor's finding on the facts is reviewable on appeal only when manifestly wrong. And when two or more reasonable inferences are deducible from the facts in proof, the inference drawn and adopted by the chancellor will control on appeal. This rule has its foundation not only in the imperative operation of the constitutional ordinances mentioned; it has a further controlling reason in this: The opportunities afforded to the trial court are far better for arriving at correct conclusions and findings upon all the questions of fact. Of this matter our supreme court has said:  `Here we have nothing but the naked record before us; there, in most cases, the parties themselves are in the presence of the court and testifying. The manner of testifying, and their appearance upon the witness stand, and many other things, are influential in determining the triers of fact;' or as said in another case: The decision of the chancellor where the evidence is conflicting will not be disturbed on appeal, since he is better able to determine the truth of the matter than the appellate court." (Emphasis added).
We cannot say that the chancellor's findings of fact as to liability are manifestly wrong. In fact, we are of the opinion that his findings of fact are supported by substantial evidence and that he was correct in finding and concluding that the forty-one defendants named in the trial court's final decree are jointly and severally liable in damages to the appellee.
The only other point that the defendants-appellants seriously argue is that the chancellor's award of damages was greatly excessive on this record. We agree.
The only witness who testified as to damages was Dr. Guy T. Peden, Director of the Bureau of Business and Economic Research at Mississippi State University. However, it was in his capacity as a partner in Associated Research Consultants, a private partnership, that he was employed to research and analyze the damages suffered by the appellee.
Dr. Peden classified himself as a micro-economist. Webster's Third New International Dictionary (1961) defines microeconomics as: "A study of economics in terms of individual areas of activities (as a firm, household, prices)  opposed to macroeconomics." He admitted that this was his first and only investigation and analysis of a retail grocery business, and that he was not an expert in this field. He testified that the life of Pak 'N Sak would be 35 years and that 9 years had been used up, so the remaining life would be 26 years. This was the first time he had ever attempted to predict the life expectancy of any business.
There were several factors that he admitted that he did not take into consideration in arriving at the amount of damages, and we think the failure to take these factors into consideration constituted a fatal error in his calculation of damages sustained by the appellee.
We refer first to the fact that all of the stock in A.G. Corporation was owned by Gilbert L. Allen, his wife and four children. Allen was president and his wife was secretary of the corporation. They both drew salaries from the corporation and the facts of economic life were that the Allens were not concerned whether the reward for *628 their labors was in the form of salaries or dividends on their stock.
The figures as to operating expenses that Dr. Peden admittedly used in arriving at the average annual net profits of $8,219.00 could have been rendered completely unreliable if the Allens had been of a mind to increase their salaries as officers of the corporation and thus decrease the annual net profits; or decrease their salaries and increase their net profits from Pak 'N Sak.
The chancellor, as did Dr. Peden, found that Gilbert Allen operated the business much more efficiently than the ordinary store owner, and that he was dedicated and devoted to his work. As to Allen's salary, the chancellor commented in his opinion: "The record reflects that a salary was being received during the pertinent period, but, likely, not as much as President Allen could have commanded in another similar business."
Another factor that was not taken into consideration was the location of this small retail grocery on the public square of Grenada in the heart of the business district. The testimony was that two supermarkets had recently moved from the public square to shopping centers in the suburbs of Grenada. That testimony bears out the fact that the same thing was happening in Grenada as in every other urban center of our country. In the last decade there has been a great exodus of families from the downtown district of a city to the suburbs. Even though Dr. Peden's testimony was that the corner grocery depends more than any other business on the location of homes and households, he did not take this out-migration into consideration in arriving at the average annual profits of the appellee for the next twenty-six years.
Another factor, peculiar to Grenada, which was not taken into consideration by him, was that when Interstate Highway 55 is completed the old business district, where Pak 'N Sak was located, would be completely bypassed. This would be a drastic change because old U.S. Highway 51 since its construction many years ago had run through the heart of the business district of Grenada.
Although the appellee went into business about the middle of 1956 and had operated continuously in the same location through 1959, this period was not considered in arriving at the annual net profit, it being characterized by Dr. Peden as the formative period with decided "ups and downs" and, therefore, not a reliable indicator.
In figuring the average annual net profit, Dr. Peden considered the six year operating period from 1960 through 1965. The net profit for each of those years was:

 1960 $7,702
 1961 3,060
 1962 11,051
 1963 7,884
 1964 10,153
 1965 7,910

There were rather pronounced fluctuations even during those years. The witness frankly admitted that it would have been much better to have a broader base and a longer period of time to figure the probable future success of a business.
The record reflects that the appellee lost $1276.00 during the last calendar quarter of 1965. The appellee lost $4300.00 during the first quarter of 1966. These losses were sustained at a time when there was no picketing and boycotting. No attempt was made by the witness to apportion the losses between the period immediately preceding the boycott and the period of the boycott.
No evidence was introduced of Mr. Allen's salary with the Memphis concern with whom he took a position immediately after Pak 'N Sak went broke. His present *629 salary should have been considered; it might be that he is now drawing a salary that would equal both his salary from Pak 'N Sak and the dividends on his stock in A.G. Corporation.
In his final tabulation, Dr. Peden multiplied the average annual net profit of $8,219.00 by 26 years, the estimated remaining life of the appellee corporation, and arrived at the figure of $213,694.00. He then discounted this figure at 4.63% per annum (which was the median yield on long-term United States Government bonds) for 26 years, and arrived at the present damages of $122,791.95.
The chancellor accepted the testimony and figures of this one witness as to damages suffered by A.G. Corporation, appellee, in toto. He did find that the appellee had used up ten years of its life, rather than nine, as figured by Dr. Peden, and he deducted one year's annual net profit of $8,219.00 from $122,791.95, and arrived at $114,572.95 as appellee's damages.
Since neither the chancellor nor Dr. Peden, the sole and only witness on the amount of the damages, considered the factors which we have heretofore mentioned and discussed in arriving at the amount of damages, we feel that the figure of $114,572.95 is clearly excessive and is too conjectural and speculative. We, therefore, cannot approve the judgment of the trial court as to the amount of damages suffered by the appellee.
We thus reverse as to damages only, and remand this cause for a further hearing on the amount of damages suffered by the appellee.
Affirmed as to liability, but reversed and remanded as to damages.
GILLESPIE, P.J., and PATTERSON, INZER, and SMITH, JJ., concur.