Woody B. SEARLE and Vonetta Searle, Randy B. Searle and Vickie Searle, Rance W. Searle and Gail Searle, Rhett A. Searle and Tony Searle, Plaintiffs and Appellants,

v.

Lonnie JOHNSON and the Humane Society of Utah, Defendants and Respondents.

No. 17349.

Supreme Court of Utah.

April 20, 1982.

Gayle F. McKeachnie, Vernal, for plaintiffs and appellants.

Craig Stephens Cook, Kim R. Wilson, Salt Lake City, for defendants and respondents.

HALL, Chief Justice:

Plaintiffs sued defendants under a tort theory of intentional interference with plaintiffs' prospective economic advantage. Plaintiffs alleged that defendant Lonnie Johnson, Executive Director of the Humane Society of Utah, had injured plaintiffs' tourist businesses by publicly discouraging tourism in Uintah County, where plaintiffs' businesses are located. The trial court granted summary judgment in favor of defendants on the basis that Johnson's publicity campaign was a privileged exercise of his First Amendment right to petition, protecting him from tort liability.

Since 1971, members of the Humane Society have been distressed by the condition of the dog pound maintained jointly by Uintah County and the City of Vernal. Between 1971 and 1975, Johnson and others repeatedly contacted city and county officials to complain about cruelty and unhealthy treatment of the dogs in the pound, but no action was taken. During February and March of 1976, after notifying a Vernal City Council member of its intention, the Humane Society conducted a media campaign to increase public awareness of conditions at the pound in order to create public pressure upon government officials to make improvements. Part of this publicity was directed outside Uintah County in an attempt to discourage tourists from visiting the area until conditions were corrected. Johnson told newspaper reporters that he hoped to adversely affect tourism in Uintah County in order to increase pressure upon local officials to make such corrections.

Plaintiffs alleged that as a result of defendants' actions, their businesses suffered a large reduction in tourist trade and income beginning in 1976. They urged the trial court to grant recovery in tort for intentional interference with prospective economic advantage. According to plaintiffs, the generally accepted elements of this tort as adopted in other jurisdictions are:

(1) the present or probable future existence of a contract, business relations or business expectancy beneficial to the injured person;

(2) knowledge of the contract, relations or expectancy on the part of the interferer;

(3) intentional interference which induces or causes a termination of the contract or foreclosure of the business relations or expectancy; and

(4) resultant damages.

23 *Duke L.Rev.* 341, 343 (1974).[1]

Defendants assert that proof of this tort requires, in addition, a showing of either malice or "unlawful means" of interference[2] and that no damages may be recovered for injury to business which results from the exercise of a valid legal right.

The trial court did not address the question of whether intentional interference with prospective economic advantage constitutes a valid cause of action in Utah or what the elements of such a tort might include. Rather, the court determined that plaintiffs were barred from recovery against defendants under any theory because defendants' activities were "privi-

---

1. See also proposed Restatement 2d of Torts, § 766(B); *Gammon v. Federated Milk Producers Ass'n*, 14 Utah 2d 291, 383 P.2d 402 (1963).

2. *Rosenberg v. Del-Mar Div., Champion Int'l Corp.*, 56 A.D.2d 576, 391 N.Y.S.2d 452 (1977); *Davis v. Lewis*, Tex., 487 S.W.2d 411 (1977).

leged on the basis of the First Amendment right to petition ... even though it conflicts with commercial efforts."

Because the trial court's application of First Amendment privilege to defendants' activities constituted the sole basis for its summary judgment in defendants' favor, this Court need not reach the further issues of whether plaintiffs' theory of recovery is valid and, if so, whether they have alleged facts sufficient to support such recovery. Our holding relates only to the question of whether defendants can claim absolute First Amendment protection for their activities.

The trial court's summary judgment relies principally on the recent case of *Missouri v. National Organization for Women, Inc.*, 620 F.2d 1301 (8th Cir. 1980), *cert. denied*, 449 U.S. 842, 101 S.Ct. 122, 66 L.Ed.2d 49 (1980), which stated that "the right to petition is of such importance that it is not an improper interference even when exercised by way of a boycott." 620 F.2d at 1317. In that case, the National Organization for Women, Inc. (NOW), organized a convention boycott against the states which had not ratified the proposed Equal Rights Amendment. Resulting revenue losses in Missouri damaged motels and restaurants and extended "to all parts of the economy of the state." The state of Missouri sued NOW as *parens patriae* for its citizens, requesting injunctive relief under the Sherman Act and also alleging intentional interference with prospective economic advantage, the tort alleged by plaintiffs in the instant case. NOW defended on the ground that its organization of the boycott was privileged under the First Amendment as an attempt to influence the legislative process.

The United States Court of Appeals, Eighth Circuit, held that neither statutory antitrust prohibitions nor common law tort theory provided Missouri with a remedy against NOW. The court's opinion focused primarily on the issue of whether the Sherman Act should be applied to political activities affecting commerce. After concluding that under the so-called "Noerr-Pennington" doctrine [3] NOW's political activity was not subject to the Sherman Act, the court briefly discussed Missouri's common law tort claim. On this subject, the court ruled that the "Noerr-Pennington" principle should be extended to protect NOW's political activity against tort claims as well as antitrust claims.

*Missouri v. NOW* did not resolve the issue presented by the instant case—namely, whether a boycott directed at a "secondary" target qualifies as a lawful exercise of First Amendment privilege. *Missouri v. NOW* did not hold that every political boycott is protected by the First Amendment regardless of the manner in which it is conducted. In determining that NOW's activities were privileged against antitrust and tort claims, that court did not analyze the nature of the NOW boycott or formulate criteria for determining when a boycott may be classified as a proper exercise of First Amendment rights.[4] Rather, the court proceeded on the assumption that NOW's activities were themselves a legitimate exercise of such rights.

The issue presented to the Eighth Circuit, as characterized by the decision of the federal district court, was

> whether NOW's actions, *which are themselves an exercise of first amendment rights*, constitute a violation of the Sherman Act. [Emphasis added.]

*Missouri v. National Organization for Women, Inc.*, 467 F.Supp. 289, 304 (W.D.Mo. 1979). The district court observed:

---

**3.** *Eastern Railroad Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 864 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

**4.** Senior Circuit Judge Gibson, dissenting from the Eighth Circuit decision, criticized the fail-

ure of the majority to "undertake a more comprehensive balancing of the important governmental interest in preserving the free enterprise system with the interest of people to use this particular method of influencing legislation." 620 F.2d at 1324; see also 620 F.2d at 1319–26.

If NOW's actions were not a *legitimate* effort to influence the legislature, this Court would be presented with a different case. [Emphasis added.]

467 F.Supp. at 306.

Missouri urged the Eighth Circuit, on appeal, to consider whether the manner in which NOW had exercised its right to petition was in fact legitimate, alleging that NOW had actually conducted an unprivileged "secondary" boycott. Viewing this argument as precluded by the posture of the case,[5] the court found no need to discuss it in connection with Missouri's common law tort claim.[6] Thus, the question of whether a secondary boycott is itself an absolutely privileged activity remains to be decided.

 In judging whether or not a particular boycott is privileged under the First Amendment, courts have distinguished between primary boycotts, directed at the party from whom action is sought, and secondary boycotts, which damage a neutral third party with the object of forcing that party to intervene in behalf of the boycotting organization. While many courts have recognized the right to engage in a peaceful primary boycott,[7] secondary boycotts have not often received First Amendment protection. Because such boycotts contain, in addition to the element of speech, an element of conduct designed to coerce action by others, they are not absolutely privileged under the First Amendment; the right to express opinions through action must be limited by the constitutional rights of those acted upon.[8]

 The United States Supreme Court, in *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949), upheld a state court injunction against a secondary boycott, observing:

[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed. Such an expansive interpretation of the constitutional guarantees of speech and press would make it practically impossible ever to enforce laws against agreements in restraint of trade as well as many other agreements and conspiracies deemed injurious to society. [Citations omitted.]

336 U.S. at 502, 69 S.Ct. at 691. Accordingly, courts have refused to classify as privileged boycotts which entail coercion, violence, illegal objectives or unnecessary damage to parties outside the dispute.

The United States Congress has established a statutory policy against secondary boycotts as they pertain to labor disputes by expressly prohibiting any labor organization from engaging in such a boycott and by providing a damage remedy for violations.[9] The right of Congress to enact such legislation has been upheld consistently against attacks based on First Amendment privilege.[10] Similarly, Utah Code Annotated,

---

**5.** 620 F.2d at 1312, n. 12.

**6.** In its discussion of the Sherman Act, the court appears to have concluded that the NOW boycott, although "unethical," was still "legitimate" based on the reasoning of the *Noerr* case, *supra*, n. 3, which the Eighth Circuit viewed as "not distinguishable analytically" in its facts. 620 F.2d at 1312 & n. 12.

**7.** But cf. *Council of Defense v. Int'l Magazine Co.*, 267 F. 390 (8th Cir. 1920) (political magazine boycott held prohibited by Sherman Act); *State v. Horsemen's Benevolent & Protective Ass'n*, 55 A.D.2d 251, 389 N.Y.S.2d 868 (1976) (concerted effort to influence legislature held not exempt from New York Donnelly Act).

**8.** See, *e.g.*, *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); *Cox v. Louisiana*, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965).

**9.** 29 U.S.C.A. §§ 158(b)(4)(B), 187.

**10.** *NLRB v. Wine, Liquor & Distillery Workers Local 1*, 178 F.2d 584 (2d Cir. 1949); *Printing Specialties & Paper Converters Local 388 v. LeBaron*, 171 F.2d 331 (9th Cir. 1948); *Carpenters Dist. Council v. Sperry ex rel. NLRB*, 170 F.2d 863 (10th Cir. 1948).

1953, 34–20–1(2), declarations of policy, provides:

> It is also recognized that whatever may be the rights of disputants with respect to each other in any controversy regarding employment relations, *they should not be permitted in the conduct of their controversy to intrude directly into the primary rights of third parties to earn a livelihood, transact business, and engage in the ordinary affairs of life* by any lawful means and free from molestation, interference, restraint, or coercion. [Emphasis added.]

Utah Code Annotated, 1953, 34–20–8(2)(e) labels secondary boycotts as an unfair labor practice. "Secondary boycott" is defined in 34–20–2(10) as follows:

> The words "secondary boycott" include combining or conspiring to cause or threaten to cause injury to one with whom no labor dispute exists, whether by: (a) withholding patronage, labor, or other beneficial business intercourse; (b) picketing; (c) refusing to handle, install, use, or work on particular materials, equipment, or supplies; or (d) by any other unlawful means, in order to bring him against his will into a concerted plan to coerce or inflict damage upon another.

Almost every other state legislature has acted to effect the same policy.[11]

The United States Supreme Court, in *Carpenters Local 213 v. Ritter's Cafe*, 315 U.S. 722, 62 S.Ct. 807, 86 L.Ed. 1143 (1942), approved the policy of a state "to localize industrial conflict by prohibiting the exertion of concerted pressure . . . wholly outside the economic context of the real dispute." In that case, which concerned a secondary boycott, the Court stated:

> The right of the state to determine whether the common interest is best served by imposing some restrictions upon the use of weapons for inflicting economic injury in the struggle of conflicting industrial forces has not previously been doubted. But the petitioners now claim that there is to be found in the Due Process Clause of the Fourteenth Amendment a constitutional command that peaceful picketing must be wholly immune from regulation by the community in order to protect the general interest, that the states must be powerless to confine the use of this industrial weapon within reasonable bounds.

> \* \* \* \* \* \*

> . . . But recognition of peaceful picketing as an exercise of free speech does not imply that the states must be without power *to confine the sphere of communication to that directly related to the dispute. . . .* Such a view of the Due Process Clause would compel the states to allow the disputants in a particular industrial episode to conscript neutrals having no relation to either the dispute or the industry in which it arose. [Emphasis added; citations omitted.]

315 U.S. at 725, 727, 728, 62 S.Ct. at 809, 810.

In *Carpenters District Council v. Sperry ex rel. NLRB*, 170 F.2d 863, 868–69 (1948), the United States Court of Appeals, Tenth Circuit, addressed the claim of the defendant union that its peaceful picketing and blacklisting of a construction company was protected by the First Amendment. The court noted that a peaceful picketing boycott "may constitute a phase of the constitutional right of free utterance, if the blacklist is confined to the name of the employer primarily involved in the controversy." The court refused, however, to extend such protection to the defendants' activities, which had damaged a neutral party. The court held:

> [A] secondary boycott which has the effect of substantially burdening or obstructing intrastate commerce is not protected by the First Amendment . . . .

Subsequent cases have similarly distinguished between primary and secondary

---

11. *Carpenters Local 213 v. Ritter's Cafe*, 315 U.S. 722, 728 & n. 1, 62 S.Ct. 807, 810 & n. 1, 86 L.Ed. 1143 (1942).

boycotts in considering the application of First Amendment privilege.[12]

■ The primary-secondary boycott distinction applies to political as well as industrial boycotts. In *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 514, 92 S.Ct. 609, 613, 30 L.Ed.2d 642 (1972), a case involving the right to petition public administrative and judicial bodies, the United States Supreme Court cited secondary boycotts as an example of a speech-related activity which may be prohibited without contravening First Amendment rights.

In *Southern Christian Leadership Conference, Inc. v. A. G. Corp.*, Miss., 241 So.2d 619 (1970), the defendant organization boycotted a group of white merchants to protest racially discriminatory employment practices. The plaintiff, whose grocery store was forced out of business by the boycott, sued for damages under a tort theory of injury to business. The Mississippi Supreme Court, while fully recognizing defendants' First Amendment right to boycott, noted that "no complaint of any kind, oral or written" had ever been made against the plaintiff and emphasized the following language in the plaintiff's complaint:

> [T]he complainant asserts that it at no time material hereto had any dispute, disagreement or controversy with any of the defendants herein or the combination thereof.

241 So.2d at 621. The court continued:

> The whole trouble in this case was that these defendants had no complaint or grievance or even gripe against the [plaintiff]. . . .
>
> \* \* \* \* \* \*
>
> The [plaintiff] was, in effect, an innocent bystander who ultimately became the innocent victim of this struggle for political and economic power.

241 So.2d at 624. Characterizing defendants' use of a secondary boycott as an "unlawful means" of protesting, the court held them liable for damages.

In *NAACP v. Claiborne Hardware Co.*, Miss., 393 So.2d 1290 (1980), *cert. granted*, —— U.S. ——, 102 S.Ct. 565, 70 L.Ed.2d 473 (1981), a later Mississippi case with similar facts, a state chancery court awarded damages to the plaintiff merchants under a statute prohibiting secondary boycotts.[13] Although the Mississippi Supreme Court found that the statute had not been in effect at the time of the defendants' boycott, it affirmed on the basis of the common law tort theory of injury to business which had been used in *Southern Christian Leadership Conference v. A. G. Corp., supra.* The court observed:

> It appears . . . that some of the areas for remedial action were within the power of the boycotted, and that others of them were public in their nature . . . . As to these public complaints, the merchants could only use the power of their influence to whatever degree such influence reached. The blacks expected the application of that influence and pressed into operation the boycott of the white merchants with that goal in mind . . . . [Referring to the killing of a protester by policemen, one witness] testified that "the white merchants didn't have anything to do with Jackson's death—but you've got to hurt who you can . . . ."

393 So.2d at 1300. The court found that the NAACP had used illegal means in conducting the boycott and held:

> The present case . . . is so strikingly similar to this Court's decision in *Southern Christian Leadership Conference, supra*, that that decision and the law therein held to be applicable are compelling here, and by it we are impelled to find

---

**12.** See cases cited at n. 10, *supra; California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *NLRB v. Denver Bldg. & Constr. Trades Council*, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951); *Collier v. Operating Eng'rs Local 101*,

228 Kan. 52, 612 P.2d 150 (1980); see also dissenting opinion of Senior Circuit Judge Gibson, *supra*, n. 4, at 1325, n. 19.

**13.** Miss.Code Ann., § 97–23–85 (1972).

that liability for damages attached to NAACP ....

393 So.2d at 1302.

Defendants cite *Eastern Railroad President's Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 864 (1961); *Sierra Club v. Humboldt Fir, Inc.,* 349 F.Supp. 934 (N.D.Cal.1972), and other cases to support their position that the right to petition a governmental body is absolutely privileged under the First Amendment unless the petitioning effort is a "sham." However, only three of the cases cited in defendants' brief deal with any sort of boycott. The first is *Missouri v. NOW,* discussed above. The second, *Henry v. First National Bank of Clarksdale,* 595 F.2d 291 (5th Cir. 1979), concerned only the validity of a temporary injunction granted by a federal district court in connection with *NAACP v. Claiborne Hardware Co., supra.* The court there emphasized that its review was "limited to an inquiry into whether the district court could, without abusing its discretion, have found that the federal plaintiffs were likely to succeed on the merits of their claim" and that it wished to "intimate no opinion regarding the ultimate merit of their contentions." 595 F.2d at 302.

The third boycott case, *Crown Central Petroleum Corp. v. Waldman,* 486 F.Supp. 759 (M.D.Pa.1980), involved no claim of economic injury and no allegation of a secondary boycott. Although the court in that case held that the defendant had not violated the Sherman Act by participating in a three-day service station shut-down, it carefully limited this holding by testing the defendant's claim of First Amendment privilege against detailed criteria taken from previous cases. The court acknowledged:

> We are concerned that otherwise punishable conduct might be insulated from the ordinary legal consequences by a cloak of First Amendment protection.

486 F.Supp. at 767. The court expressly declined to hold that all political boycotts are entitled to First Amendment protection, commenting:

> Expression of an idea through conduct, however, remains at least partial conduct

and may be regulable in certain circumstances and to some extent.

486 F.Supp. at 768. *Crown Central Petroleum Corp. v. Waldman* was reversed by the U. S. Court of Appeals, Third Circuit, on procedural grounds. 634 F.2d 127 (1980).

The other cases relied on by defendants in support of their First Amendment claim contain no discussion of the use of boycotts of any kind as a means of petitioning governmental bodies. The court in the *Noerr* case expressly noted the absence of any finding that the defendant railroad had attempted to persuade anyone not to deal with the plaintiff truckers. 365 U.S. at 136, 142, 145, 81 S.Ct. at 528, 532, 533. The injury caused to the trucking company in that case, although intentional, was an incidental result of defendants' petitioning activities; it was not inflicted directly as a means of pressuring them to support defendants' proposed legislation. Nor, in the *Sierra Club* case, did the defendant Sierra Club seek, through infliction of economic injury, to force the plaintiff logging company to petition the government on Sierra Club's behalf; rather, by petitioning on its own behalf, it achieved a result which damaged the loggers. These cases provide no rule for determining the proper measure of First Amendment protection for conduct which causes injury not as a result of the petitioning activities but as a means of forcing an uninvolved party to participate in those activities.

The First Amendment obviously does not give every citizen the right to force others to express his own views. Deliberate infliction of harm on other citizens is not an absolutely privileged method for gaining the attention of a governmental body. It is true, as stated in the *Noerr* case, that

> [I]t is inevitable, whenever an attempt is made to influence legislation by a campaign of publicity, that an incidental effect of that campaign may be the infliction of some direct injury upon the interests of *the party against whom the campaign is directed.* [Citation omitted; emphasis added.]

365 U.S. at 143, 81 S.Ct. at 533. The First Amendment protects expressions designed to influence governmental action even when the content of those expressions brings incidental injury to parties concerned. But when injury is caused to a disinterested party, not by the subject matter of the expressions themselves, but by the means used to achieve such expressions, the First Amendment confers no absolute privilege.[14]

In the present case, plaintiffs allege injury resulting not from defendants' complaints to city and county officials or from their reports concerning conditions at the dog pound, but rather from intentional economic damage inflicted as a means of forcing plaintiffs to support defendants' position. The First Amendment does not protect such activity. If plaintiffs were to prove, as they presently allege, that defendants specifically intended to injure their businesses in order to coerce them to join in defendants' petitioning efforts, they would thereby negate defendants' claim of First Amendment privilege and would then be entitled to present their novel tort theory to the trial court. However, a mere showing that plaintiffs suffered as an incidental result of defendants' publicity campaign, without specific proof that defendants intentionally harmed plaintiffs in order to force them actively to support defendants' cause, would be insufficient to overcome defendants' First Amendment defense. We remand for the purpose of allowing plaintiffs to present evidence on these issues.

Reversed and remanded.

STEWART and OAKS, JJ., and J. ROBERT BULLOCK, District Judge, concur.

HOWE, J., dissents.

DURHAM, J., does not participate herein.

**14.** See *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).