393 So.2d 1290 (1980)
NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE et al.
v.
CLAIBORNE HARDWARE COMPANY et al.
No. 51488.
Supreme Court of Mississippi.
December 10, 1980.
Rehearings Denied March 4, 1981.
*1291 Alix H. Sanders, Greenwood, William R. Richardson, Jr., Arthur M. Weisburd, James Robertson, Lloyd N. Cutler, Washington, D.C., Frank R. Parker, Julie Ann Epps, Royals, *1292 Taylor & Epps, A. Spencer Gilbert, III, Gilbert & Moore, Jackson, for appellants.
Crane D. Kipp, Shell, Buford, Bufkin, Callicutt & Perry, Christopher J. Walker, Upshaw & Ladner, Dixon L. Pyles, Pyles & Tucker, Jackson, W.E. Gore, Jr., Jackson, for appellees.
Before SMITH, P.J., and SUGG and COFER, JJ.
COFER, Justice, for the Court:
Beginning April 1, 1966, a boycott of retail merchants of Port Gibson and Claiborne County was in effect for some length of time. This suit, in the Chancery Court of the First Judicial District of Hinds County, resulted from the boycott. The suit, brought by Claiborne Hardware Company and twenty-three other complainants, retail merchants in Claiborne County, and filed October 31, 1969, named as defendants the National Association for the Advancement of Colored People (NAACP), Mississippi Action for Progress (MAP), a domestic nonprofit corporation and 146 individual defendants (individuals), (NAACP, and individuals, NAACP, et al.), these individual defendants largely making common cause with defendant NAACP in the suit. The bill of complaint charged defendants with conspiracy to injure and ruin the businesses of the several complainants by tortious involvement with complainants' rights to pursue their lawful trade and business through defendants' conspiracy, boycott, interference, and restraint of trade. In their suit complainants alleged and charged:
1. The complainants charge that beginning on or about April 1, 1966, and continuing daily thereafter each, every and all of the defendants, corporate, and individual defendants, hereinbefore set forth, combined and entered into an agreement and conspiracy, with a unity of design and purpose and a preconceived plan, the malicious and unlawful object of which was to ruin and cause injury to the hereinbefore named businesses of the complainants and others; that said defendants did not enter into said conspiracy and combination for the purpose of protecting or advancing any legitimate interests of their own; and that said act constituted an unlawful conspiracy.
2. The complainants charge that the means employed by the defendants, and each of them in carrying out and to effect the purpose of the illegal and unlawful combination, plan, scheme, and conspiracy, was and is likewise malicious, illegal and unlawful; that the defendants have since April 1, 1966, daily engaged in and committed malicious, illegal and unlawful acts of injurious falsehoods, deception, force, intimidation, threats, coercion and violence against the customers and prospective customers of the complainants.
3. The complainants charge that in pursuance of the aforesaid conspiracy to injure the businesses of complainants and others, that the defendants and each of them executed and are continuing to carry out said malicious, illegal and unlawful plan and scheme to the great damage of complainants; and that said conspiracy on the part of all and each of said defendants was induced in malice toward the complainants and was and is without justification or lawful purpose; and that its objects as aforesaid have been and are being accomplished by illegal means and in an unlawful manner.
4. The complainants charge that on or about April 1, 1966, and daily thereafter, the defendants and each of them entered into an unlawful combination among themselves and others who are unknown to complainant to illegally bring about a secondary boycott to the businesses of the complainants and others with the intent and purpose of causing loss to the complainants and others by coercing the customers and prospective customers, against their will, to withdraw and withhold their beneficial business intercourse from the complainants by the infliction of physical injury to said customers and prospective customers on their person and property; by the threat of physical injury; by intimidation so as to put said customers and prospective customers in fear of such injury; through the fear of *1293 incurring the displeasure persecution and vengeance of said combination; and by threats to said customers that unless they withdrew or withheld their beneficial business intercourse from the complainants and others against whom the conspiracy, combination and concert of action is directed, that said combination would cause injury to said customers in their person, property and business. Complainants further charge that by the use of threats, intimidation, and coercion, the said defendants intended to overcome and did overcome the will of the customers and prospective customers of the complainants, and by such unlawful and illegal means, intended to and did compel said customers to refrain from trading with the complainants. Complainants further charge that said defendants committed acts and spoke words to said customers and prospective customers of complainants that caused them to fear for their lives and safety; and that they were in such apprehension of damage that said customers were and are so influenced thereby as to prevent them from freely trading with complainants, as said customers so desire to do; and that the complainants assert that they at no time material hereto had any dispute, disagreement or controversy with any of the defendants herein or the combination thereof. Complainants further charge that the said illegal secondary boycott was and is an unlawful invasion of their property rights; that complainants have been caused to suffer great harm and damage as a result thereof; and that complainants, because of said malicious attempt to irreparably injure them and each of them, without purpose, by said secondary boycott, are entitled to recover damages jointly and severally from said defendants.
(These allegations were used as complainants' basis for charging interference and restraint of trade on defendants' part, also.)
After delay in the United States District Court and the Fifth Circuit Court of Appeals [Henry v. First National Bank of Clarksdale, 50 F.R.D. 251 (N.D.Miss. 1970), 444 F.2d 1300 (5th Cir.1971), cert. denied, 405 U.S. 1019, 92 S.Ct. 1284, 31 L.Ed.2d 483 (1972), rehearing denied, 406 U.S. 963, 92 S.Ct. 2057, 32 L.Ed.2d 351 (1972)], trial was begun on June 11, 1973, on the Bill of Complaint and Cross Bills of some of the defendants. After testimony was taken over a long period of time, the chancellor rendered opinion August 9, 1976, which was followed by decree consistent therewith dated and filed on August 19, 1976.
The complainants had prayed for actual damages alleged to be in the amount of $3,542,466.04. The chancellor awarded aggregate money decree to them in the amount of $950,699 plus solicitor fees in the amount of $300,000, a total recovery of $1,250,699. Chancery jurisdiction was availed of for use of the attachment in chancery statute [Miss. Code Ann., § 11-31-1 (1972)] and for injunction. Injunction against use of guards at stores, persuading or otherwise procuring potential customers to withhold their patronage, and against individual activity by the defendants was ordered by the decree.
(Although the granting of injunction has been assigned as error, the error has not been argued, and NAACP, et al. say, at the conclusion of their brief "... the injunctive aspects of the case are now moot... .").
Appeal was taken therefrom to this Court. Defendants-appellants successfully invoked the aid of the federal court for relief against full compliance with our appeals supersedeas statute [Henry v. First National Bank of Clarksdale, 424 F. Supp. 633 (N.D.Miss. 1976), aff'd 595 F.2d 291 (5th Cir.1979)]. Appellants do not assign as error the chancellor's failure to award relief on their cross bills, nor is there a cross appeal by the complainants as to amount of the decree nor as to the court's dismissal of the cause as to certain of the defendants.
On appeal, twenty-eight errors are assigned, but appellants' arguments are made as to the following propositions:
1. The appeals for a boycott to protest racial discrimination were lawful communications protected by the First Amendment.

*1294 A. The allegedly "secondary" character of the boycott is both irrelevant and unproven.
B. The chancellor's conclusions regarding intimidation are unsupported by record and Constitutional limitations.
2. All of the three theories of liability adopted by the chancellor were erroneous.
A. Mississippi's anti-boycott statute cannot support the finding of liability.
1. The statute purports to forbid activity protected by the First Amendment and is therefore unconstitutional on its face.
2. Retroactive application of the anti-boycott statute was erroneous under state law and deprived appellants of due process of law.
B. Mississippi's trade restraint statutes do no apply to the Port Gibson boycott.
C. The common law of conspiracy to commit tortious interference with business does not support the finding of liability.
3. The chancellor erred in awarding damages without first separating out the amount of loss resulting from Constitutionally protected activity.
4. The award of damages was speculative and improper in many respects.
A. The chancellor erred in awarding damages for goodwill.
B. The chancellor erroneously depended upon indirect evidence of lost profits where more reliable evidence was available.
C. In obvious ways, the appellees' theories for calculating lost profits were improper and yield only speculative results.
D. The chancellor erred in failing to correct for appellees' mitigation of their losses.
E. The chancellor erred in awarding damages representing prejudgment interest on lost earnings.
5. The award of attorneys' fees was error because the anti-boycott statute was inapplicable and for other reasons.
A. It was error to include in the award attorneys' fees incurred in federal litigation.
B. The record contains no evidence and the chancellor made no findings to permit appellate review of the attorneys' fee award.
6. The chancellor abused his discretion in denying appellants' motion for a change of venue.
On liability, we affirm the Chancellor's decision as to some defendants, and reverse it as to others, as hereinafter indicated. We reverse as to damages and remand the case to the lower court for trial on the issue of damages only.
(MAP has filed its own assignment of errors and separate brief, all of which will be noticed later in this opinion.)
Reaching early appellants' Point VI, attacking the Chancery Court's failure to grant appellants' request for a change of venue to Claiborne County, we find no error in the retention of the case in the Chancery Court of the First Judicial District of Hinds County.
The suit might properly have been brought "in the Chancery Court of any county where the defendant, or any necessary party defendant, may reside or be found." Mississippi Code Annotated, Section 11-5-1 (1972). The suit was for injunction and recovery of damages against multiple defendants largely resident of Claiborne County. However, at least three defendants, including NAACP and MAP "resided" in the First Judicial District of Hinds County.
Appellants, in support of this assignment of error have cited Gillard v. Great Southern Mortgage & Loan Corp., 354 So.2d 794 (Miss. 1978), and Illinois Central Gulf RR v. Stedman, Admrx., 344 So.2d 468 (Miss. 1977). The Gillard case involved no resident of the county wherein the suit was brought. The Stedman case was brought in a county permissible for venue purposes by Section 11-5-1, but far from the county of the accident claiming the life of Mrs. Stedman's *1295 deceased. This Court did not hold it to be error not to grant a change of venue on that account, but pointed out that, on retrial, the reversal being on faulty instruction, the circuit court should again consider the motion for change of venue under the doctrine of forum non conveniens.
The granting of the motion was addressed to the sound discretion of the court, and, in order to assert error in refusing the change, it is necessary for the movant to show prejudice to him in the refusal, such prejudice not appearing here. Gillard, supra; Mississippi State Highway Comm. v. Rogers, 240 Miss. 529, 128 So.2d 353 (1961); Stokes v. State, 240 Miss. 453, 128 So.2d 341 (1961).
No reversible error was committed in the court's denial of the requested change of venue.
Black people number more than three-fourths of the population of Claiborne County. With the momentous weight of civil rights progress augmented in great measure by federal civil rights laws and led by dedicated activists, by the time the boycott here involved had begun the blacks had obtained overpowering authority in the ballot box. In the elections which took place in 1967 they from their number elected the chancery clerk, and might easily have put members of their ranks in practically all of the county's elective offices.
Late in 1965, a group of their numbers, whether spontaneously or by authority of some group is not clear, had put together certain complaints and areas of relief which concerned them. About the same time, the NAACP movement had taken hold in Claiborne County which movement resulted in the organization of a chapter whose power and desires were being expressed. The late 1965 points of relief and the exponents of them were silenced or otherwise replaced by a group which had the leadership of Charles Evers, Field Secretary for the NAACP. In two missives they delineated and articulated to the addressees thereof their immediate concerns.
The first of the communications, dated March 14, 1966, was addressed to the mayor and board of aldermen (obviously of the City of Port Gibson), the Claiborne County Board of Supervisors, the Board of Education and Sheriff McKay (both obviously of Claiborne County). The needs therein expressed were prefaced by a frank consideration of what may be correctly regarded as an alternative or an option probably facing those who had the power to satisfy those needs:
We hope it will not be necessary to resort to the kind of peaceful demonstrations and selective buying campaigns which have had to be used in other communities. It takes manpower, time and energy which could be better directed at solving these problems which exist in Port Gibson and Claiborne County by mutual cooperation and efforts at tolerant understanding.
No one likes to have to resort to picketing and other kinds of demonstrations ... Just as no one likes to be the target of this kind of demonstration. But this sort of thing is inevitable unless there can be real progress toward giving all citizens their equal rights. There seems to be no other alternative.
There followed twenty-one needs (less two left blank therein, Numbers 4 and 5), as follows:
1. A community affairs committee, made up of both races, needs to be officially constituted by the Mayor and Board of Aldermen, the Board of Supervisors and the undersigned, so that future problems may be anticipated and solved before they reach a breaking point.
2. All public schools of Claiborne County and Port Gibson should be desegregated, both faculty, staff and student body this coming September, 1966.
3. Three Negro policemen should be employed in Port Gibson so that there will be impartial enforcement of the laws. The Negro policemen should be assigned to work with the white policemen on an integrated basis, with power to arrest any lawbreaker.
4. (Omitted)
5. (Omitted)

*1296 6. Negroes should be employed in the welfare office so that the County may demonstrate its good faith and impartiality.
7. All business houses in the county should comply with the spirit and letter of the Civil Rights Act of 1964 by treating all customers alike and according them the use of all facilities.
8. Verbal or physical abuse of citizens by law enforcement officers must cease and Negroes are not to be addressed by terms as "boy," "girl," "shine," "uncle," or any other offensive term, but as "Mr.," "Mrs.," or "Miss," as is the case with other citizens.
9. Crossing guards are to be posted at all schools, not just the white schools.
10. All funerals shall be accorded police escort.
11. Negroes should be named to the Board of Education. And they should be Negroes satisfactory to Negro leadership.
12. Public improvements should as roads, street, lights and sewer system are most needed in predominately Negro residential areas now because of past neglect. A program for remedying this situation should be embarked on immediately.
13. The Mayor, Board of Aldermen, County officials, businessmen and church leaders should denounce all extreme groups.
14. The courtroom and all other public facilities are to be desegregated immediately by order of the proper officials. This applies to all educational, recreational and other public-owned facilities.
15. Immediate steps must be taken to insure the selection of Negroes for jury duty in as close a relationship to the population breakdown as possible.
16. Provision must be made for the use of Negroes as election officials and for all other public duties.
17. Official and semi-official boards and commissions, now and in the future, must include appropriate numbers of Negro citizens.
18. The immediate desegregation of the Claiborne County Hospital, staff, and patients.
19. Bus stations must be integrated so that Negroes may be able to use all facilities.
20. All snack bars should be removed from classrooms.
21. Salesmen should be barred from entering classrooms interrupting classes.
The letter closed with the request, "Please communicate with the undersigned so that we may arrange a meeting to discuss the details of solutions to these problems." It was signed by Calvin C. Williams, Chairman, Alexander Collins, Secretary, and James N. Dorsey, Floyd D. Rollins, Nathaniel H. Jones, Walter L. Griffin, Sr., and Mack Tisdale.
On March 23, 1966, a letter was addressed to all addressees of the March 14, 1966, letter, and to the Chamber of Commerce. It conveyed to its addresses the needs 4 and 5, omitted in the March 14, 1966, letter, expressed as follows:
4. All stores must employ Negro clerks and cashiers.
A. Two or more deputy sheriffs must be hired.
B. The city limits be extended to include Thompson Sub Division and all other areas where there is a concentrated group of citizens of Port Gibson.
C. A strong housing code should be adopted and enforced.
D. The teacher's lounge should be restored for teachers use rather than a centralize area for selling.
5. That a Negro County Agent be employed, since there is more than 8,239 Negroes in Claiborne County.
A. That a full time home demonstration agent be employed to assist the farm women and young ladies to become effective Homemakers, including, planning, feeding, and caring for the farm families.
It ended with the statement, "We shall be awaiting your answer by April 1, 1966."
In addition to the signatories to the earlier letter it was signed by Charles Evers.
*1297 This group and these objectives appear from the record to have been duly appointed and to have been arrived at and adopted by the NAACP in regular meeting.
Satisfactory response was not made during the interval prior to April 1, 1966, and, led by Evers, the boycott was begun on April 1, 1966, with a march along the white business area of Port Gibson and with a speech by Mr. Evers on the undertaking being launched. Upward of a hundred witnesses were put on the stand during the trial, (most of them defendants called adversely by the complaints), and testified, and as to be expected in such case, varying accounts of the boycott were discussed from which the conclusion is overwhelmingly warranted that it was conducted in serious fashion with planning, and expertise in control.
The NAACP met about weekly at First Baptist Church of which the Reverend Dorsey, one of the signatories of the March 14, 1966, and March 23, 1966, letters noticed above, was pastor. There were the marches and the pep speeches usually a part of such undertaking. There were the pickets with their signs; the group of men almost fifty in number who were specially conspicuous because they wore black headwear and perhaps other black clothing, so that they would be easily distinguishable. There were the "Black Times" publications, enshrouded by very little mystery as to editorship, etc., wherein the names of those being boycotted periodically appeared as well as names of some observed breaking the boycott. Eastern States Retail Lbr. Dealers v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1913). There came into being the successful black store, "Our Mart."
The picket signs, among other messages, gave information that the boycott was that of the NAACP. Many of the picketing personnel were young children.
Regrettable and lamentable events which took place during the boycott, including the following: Dr. Martin Luther King, Jr. was assassinated on April 4, 1968, at Memphis under circumstances of common knowledge. On April 18, 1969, one Roosevelt Jackson was accused of interfering with law enforcement officers of Port Gibson in their effort to make an arrest of another. Later in that day policemen, one black and the other white, went to arrest him on the charge and a struggle resulted, details of which are clouded, ending in the fatal shooting of Jackson. At Dr. King's slaying there arose generally an attitude of frustration among the blacks for whom he had worked and lived. This sense of loss is shown to have intensified the Claiborne County boycott as it also gained expression in incidents of significance. (It should be said here that there is evidence also in the record from which it might be concluded that the unfortunate event caused not even a ripple in the blacks' undertaking.) The Jackson occurrence caused the boycotting blacks to become highly incensed resulting in their demand that the policemen involved be instantly discharged and even in their requirement that the entire police force be removed. Black activity took place at Jackson's home, at the hospital to which he was taken in an act of futility, at the Courthouse, and at First Baptist Church. Members of the Mississippi State Highway Patrol were sent in to help control the situation. There was weapons' firing, by whom is not clearly detailed in the record. Physical searches netted nothing in the way of weapons, but a search of a musical instrument in the church uncovered a number of weapons. The boycott which had reduced itself to some extent by the time of Jackson's death was then intensified and the entire Claiborne County's group of white merchants were brought within its prohibitions.
The group of men above noticed came into organized being about a month after the boycott was begun. They were variously called "Black Hats," "watchers," "guards," "enforcers," "Deacons," or "Deacons for Defense." Their assignment, or their reasons for existence, was described as for the purpose of seeing to it that blacks who would trade with the boycotted white merchants were made aware of the boycott and that their cooperation was desired, and *1298 for the blacks' protection. There is testimony that these "watchers" organized themselves into a quasi-military group, drilled, bought weapons and ammunition, had target practice, two-way radios (automobile and "walkie-talkie" types), and they were sufficiently shown to have stood at corners or walked assigned areas, and stopping and interviewing would-be customers entering stores, within the area of the "watchers'" assigned patrols.
The chancellor rendered an able, detailed, analyzing opinion, fully covering the voluminous testimony. His portrayal, well supported in the record, presents a facet of the enforcement of the boycott:
The thread of fear and violence is woven throughout this case. Sheriff McKay testified that many times black people who wanted to trade with whites appealed to him for protection. He said at least 100 blacks complained to him that they had been interfered with when attempting to trade with white merchants. He said that when the "store watchers" relaxed the boycott would "loosen up," particularly on the outskirts of Port Gibson and in Hermanville and Pattison.
Very shortly after the boycott started, Sheriff McKay was near Hudson's Store when he noticed a group of black people gathered around a car parked in front of the store. McKay approached the crowd and said he heard the defendant Calvin Williams tell a black man named Darden that he (Darden) could not go into the store because it was under boycott. McKay intervened, whereupon, he said, he heard Calvin Williams say to Darden: "You can go in, but the sheriff here isn't going to sleep with you at night." Darden did not go into the white store.
The atmosphere of fear that prevailed among blacks from 1966 until 1970 is strikingly revealed in the testimony of many of the witnesses.
James Gilmore, a black man, ignored the boycott. On the night of August 22, 1966, Gilmore's home was shot into. Elmo Scott, Jr., a member of the NAACP and of the "Deacons", together with two other young black men, Calvin Bailey and James Whitney, were arrested for this act and were convicted. The Mississippi Supreme Court reversed and remanded the case,[1] because of exclusion of Negroes from the grand jury. On retrial the jury was unable to agree. At the time of the trial, these people had not been retried.
Defendant Rudolph J. (Rudy) Shields, formerly of Chicago, was the principal figure in several altercations. He boasted that he was the "most jailed person in the Claiborne County boycott." This man was the acknowledged leader of the "Deacons."
Laura Cullens testified that she lived about a quarter-mile from the city limits of Port Gibson on Highway 18. She refused to join the NAACP, and she ignored the boycott. Her name, among many others, was called out at the NAACP meetings, and she was derisively referred to as an "uncle Tom." She was vilified and abused. In November 1966 shotgun pellets were fired into her home.
Muriel Cullens, a son of Laura Cullens, did not observe the boycott and was the target of harassment by blacks. Cullens' car was run into and badly damaged, and a brick was thrown through the windshield.
In April 1966 soon after the boycott was started, Johnny Cox, a black man, and his wife were stopped by "store watchers" who attempted to prevent Mrs. Cox from going into the O.K. Cleaners, a white-owned business, to get some clothing. They had to get police protection in order to go into this cleaning establishment. About a week later, shotgun blasts were fired into the Cox home near Hermanville. Pistol shots were fired at Cox.
James Bailey, a 200-pound ex-football player, testified regarding his activities as a "store watcher." He was instructed to stop any black person he saw about to enter a white business house. He said *1299 that he had been a "bad boy" and had been convicted for molesting a child, resulting in sentence to the State Penitentiary. He was instructed to take the name of any black person going into a white-owned business and report same to defendant Pete Gusta. On one occasion, he stopped Willie Butler, an elderly black female whom Bailey referred to as "Nig" Butler, as she was going into the Piggly-Wiggly Store. Despite his warnings, she went into the store and purchased some items of groceries. He watched her house and saw groceries delivered there by a white-owned store. He instructed her to stop trading with whites, whereupon she told him she would trade with whom she pleased. Bailey went into this elderly woman's yard and destroyed her flower garden by way of punishing her.
There is evidence in the record that an elderly black man called "Preacher" White (Deceased at the time of trial) was stripped of his clothing and whipped by a group of young blacks because he refused to honor the boycott.
Eddie Lewis, a black man, refused to join the NAACP and refused to honor the boycott. He was warned by Rudolph Shields to stay out of white-owned stores. Lewis purchased a bottle of whiskey at a white-owned liquor store, and was observed by Alfred Lee "Fats" Davis, a NAACP member and activist in the black boycott. Davis took the whiskey away from Lewis and denounced him in highly-uncomplimentary language for dealing with white people.
Willie Myles testified that he refused to stop trading with white stores. His name was read out at NAACP meetings as a "boycott breaker." He said he received threatening telephone calls. On one occasion, the Port Gibson police had to give him an escort when a carload of young blacks began following him. He received a warning that he was going to be whipped for buying gasoline at a white-owned service station.
Jasper Coleman, a black man, testified that he did not join the NAACP and continued to trade with white merchants after being warned by Walter Griffin and Calvin Bailey. The tires on Coleman's automobile were slashed.
Emerson Davis, a black commercial fisherman, testified that he refused to join the boycott. He testified that Rudolph Shields, Jimmy Ellis and three other blacks grabbed him, carried him down a street and beat him. He was denounced as an "uncle Tom." He said that he received threats on his life. James Bailey told him that he was going to kill him (Davis).
Unquestionably, the word "got around" in Port Gibson and Claiborne County that physical harm, as well as vilification and ostracism, could very well be the lot of any black person observed trading with whites. As a matter of fact, these things were promised by the Field Secretary of the National NAACP, Charles Evers, on at least two occasions, and it is apparent that the black people believed him. This NAACP-sponsored boycott was a definite success insofar as economic damage to the white merchants was concerned, even though the victims  the white merchants  had no power to grant the demands made on the county and municipal authorities.
The testimony revealed that the defendant NAACP provided attorneys to defend black persons arrested and charged with violating the laws of Mississippi in connection with acts arising from the boycott; and this nonresident corporation posted bail bonds and on occasion paid fines of black persons convicted of criminal charges.
[It should be here noted that Evers promised, in what appears to have been a nationwide televised speech, that "if we catch you going in any of them racists white stores, we're gonna break your... neck."]
Mrs. Leesco Guster, one of the appellants, testifying as to Preacher White's alleged experience as a boycott breaker, said, "It was just talk, and I can't recall where it came from, because when talk starts in a small town, it goes everywhere."
*1300 Testimony by some of the appellant MAP's witnesses tended to show fright on the part of the cooks in the kitchens of Head Start, a service supplied by MAP, causing them to refrain from handling groceries from white grocers. Attorneys for appellees put into the record that they "will stipulate that all of the Head Start MAP employees in Claiborne County were afraid to do business with white merchants."
The chancellor found, as he was bound to do from the record, that:
In carrying out the agreement and design, certain of the defendants, acting for all others, engaged in acts of physical force and violence against the persons and property of certain customers and prospective customers. Intimidation, threats, social ostracism, vilification, and traduction were some of the devices used by the defendants to achieve the desired results. Most effective, also, was the stationing of guards ("enforcers," "deacons," or "black hats") in the vicinity of white-owned businesses. Unquestionably, the evidence shows that the volition of many black persons was overcome out of sheer fear, and they were forced and compelled against their personal wills to withhold their trade and business intercourse from the complainants. (Emphasis added).
In Southern Bus Lines, Inc. v. Amalgamated Association of Street, Electric Railway and Motor Coach Employees, 205 Miss. 354, 38 So.2d 765 (1949), a decision involving a labor strike attended by violence against which, in part, an injunction was being sought by appellant, this Court said in quoting from Milk Wagon Drivers Union of Chicago, Local No. 753 v. Meadowmoor Dairies, 312 U.S. 287, 295, 61 S.Ct. 552, 555, 556, 85 L.Ed. 836, 842 (1941):
... Judges need not be so innocent of the actualities of such an industrial conflict as to find in the Constitution, state or federal, a denial of the right of Mississippi to conclude that the use of force was not the conduct of a few irresponsible outsiders. The Fourteenth Amendment still leaves the state ample discretion in dealing with manifestations of force in the settlement of industrial conflicts.
(205 Miss. at 361, 362, 38 So.2d at 770).
It appears from the demand letters noticed hereinabove that some of the areas for remedial action were within the power of the boycotted, and that others of them were public in their nature within the purview of the Port Gibson officials, the Claiborne County officials, and the Chancery Court. As to these public complaints, the merchants could only use the power of their influence to whatever degree such influence reached. The blacks expected the application of that influence and pressed into operation the boycott of the white merchants with that goal in mind. On April 18, 1969, when Jackson was killed, as noted above, at the hands of two policemen, one black and the other white, there was demand articulated that these officers be discharged, and the boycott was intensified and made again applicable countywide. Ira Thomas testified that, "the white merchants didn't have anything to do with Jackson's death  but you've got to hurt who you can... ."
There was extended testimony relative to the demands for the employment of black citizens at responsible jobs, and witnesses expressed the view that these demands should be met even if either it meant the discharge of white employees already on these jobs or that there would be two employees doing the job requiring only one employee to do, demands for reverse racial discrimination, as found to be true in Hughes v. Superior Court of California, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985 (1950).
Appellees rely in part on Mississippi Code Annotated, section 97-23-85 (1972), which was adopted by the 1968 session of the Legislature and became effective July 30, 1968. Its constitutionality is vigorously attacked by appellants who assert that it is contrary to the right of free speech guaranteed by the First Amendment to the United States Constitution.
The boycott began April 1, 1966. Section 97-23-85 was adopted in the 1968 legislative session, and went into effect July 30, 1968, when the boycott had been in operation for upward of two years. The statute *1301 clearly reflects no retrospective force, but only prospective. Mladinich v. Kohn, 186 So.2d 481 (Miss. 1966), and the many decisions therein contained. We are of the opinion that the statute is not applicable to the present decision.
Appellees likewise, in part, rely upon our restraint of trade statute, section 75-21-1, et seq., and argue that the activity complained of operated to restrain their trade and their right to trade. The United States Supreme Court has seen fit to hold boycotts to achieve political ends are not a violation of the Sherman Act, 15 U.S.C. § 1 (1970), after which our statute is patterned. We, in turn, have been influenced by the decisions of that Court in interpreting and applying it. While economic goals were sought by appellants and while economic good was challenged and endangered in and caused to suffer by, the boycott, we find that the present decision may be made without application of the restraint of trade statute. United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); Eastern Railroad Presidents Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). See also, State of Missouri v. National Organization for Women, Inc., 620 F.2d 1301 (8th Cir.1980), appeal for cert. filed, 49 U.S.L.W. 3005 (June 25, 1980), No. 79-2039; and Machesky v. Bizzell, 414 F.2d 283 (5th Cir.1969).
The bill of complaint relies in part upon the common law protections which had formed the base for this Court's decisions in Southern Christian Leadership Conf. v. A.G. Corp., 241 So.2d 619 (Miss. 1970), and Southern Bus Lines, Inc., supra. We regard that law as determinative here.
Judge (now Chief Judge) Coleman of the Fifth Circuit Court of Appeals clearly stated in Smith v. Grady, 411 F.2d 181, 187 (5th Cir.1969), that: "Any kind of boycott is unlawful if executed with force or violence or threats... ." If any of these factors  force, violence, or threats  is present, then the boycott is illegal regardless of whether it is primary, secondary, economical, political, social or other. All of these factors are here present, and the boycott was illegally operated and we do not need to examine into its type, whether primary or other.
The presence of a conspiracy is beyond peradventure. Southern Christian Leadership Conf., supra; Wagley v. Colonial Baking Co., 208 Miss. 815, 45 So.2d 717 (1950); New York Mailers Unions v. National Labor Relations Board, 316 F.2d 371 (D.C. Cir.1963).
An examination of our statute, section 97-1-1, and our decisions in Southern Christian Leadership Conf., supra; Mississippi Power & Light Co. v. Town of Coldwater, 234 Miss. 615, 106 So.2d 375 (1958); and Southern Bus Lines, Inc., supra, will reveal the fact that a conspiracy to be a conspiracy, must be tainted with illegality, there must be an agreement to accomplish an illegal objective, or an agreement to accomplish a legal objective by the use of illegal means. The agreed use of illegal force, violence, and threats against the peace to achieve a goal makes the present state of facts a conspiracy. We know of no instance, and our attention has been drawn to no decision, wherein it has been adjudicated that free speech guaranteed by the First Amendment includes in its protection the right to commit crime.
The SCLC opinion, supra, brought under unfavorable study the matter of boycotts without advance warning as to grievances held against the boycott victim, the same as here exists.
Mississippi Code Annotated, section 97-23-83 (1972), adopted and effective from February 9, 1966, a date antedating the beginning of the boycott, makes it a criminal offense to threaten with bodily harm, intimidate, or coerce a person to prevent the offended person from doing business with another. This statute was applied in Shields v. State, 203 So.2d 78 (Miss. 1967). Shields was one of those activists helping in the boycott, and was convicted of violating this statute. His case was reversed, however, because of deficiency in the jury list from which the convicting jury had been drawn.
*1302 That statute declares it to be a misdemeanor and punishable:
If any person shall in any manner threaten with bodily harm, intimidate or coerce another person to prevent said person from lawfully trading, or carrying on business, including buying or selling, he shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished by imprisonment for not more than one (1) year in the county jail or be fined not more than one thousand dollars ($1,000.00), or both.
That statute applied to, and was violated in, the coercion, intimidation, and threats which were a part of the boycott activity and contributed to its almost complete success.
The present case, in the relief sought and granted, the conduct of the boycott, and the applicable law, is so strikingly similar to this Court's decision in Southern Christian Leadership Conference, supra, that that decision and the law therein held to be applicable are compelling here, and by it we are impelled to find that liability for damages attached to NAACP and, subject to some exceptions hereinafter noticed, to the individual defendants.
MAP, as earlier herein noticed, filed its own assignments of error incorporating those of NAACP, et al. It also assigned as error the holding that MAP was a part of the conspiracy to boycott illegally, and the chancellor's rejection of its defense of duress, and further assigned as error the failure of appellees to furnish bill of particulars and the Court's finding that it was subject to suit and damages award in the absence of consent by the United States Government.
MAP is a creature of Mississippi statute as a nonprofit corporation. Mississippi Code Annotated, section 79-11-1, et seq. (1972). It was incorporated on September 13, 1966, for implementation of the government's Head Start program, 42 U.S.C. § 2928, et seq., its participation therein being the provision of food, educational and other services to needy children in twenty counties of the state of which Claiborne County is one. The program is aimed specially at pre-school children of low-income families. It began operation in Claiborne County on January 16, 1967, with the intention to buy groceries from black and white stores, which groceries would be needed for meals for the children being benefited by the program. This plan was immediately foundered by the boycott, causing inquiries, investigations, conferences, and planning within MAP and between MAP and boycott leaders and others. A program arrived at to buy from four black groceries and four white groceries was immediately abandoned because the Head Start cooks were afraid to do business with the white merchants (this fact established in the record by stipulation of counsel for appellees), and Evers threatened to banish the program from the county rather than to permit the expenditure of government money with white merchants contrary to the very boycott itself. Finally, MAP adopted formally a course of action which required the purchase of all groceries from black stores, and, if these could not meet the MAP needs, then purchases would be made outside the county.
MAP sought and obtained an opinion or opinions from its attorneys, upon which it issued non-participation guidelines in political matters.
The record does not warrant a finding that MAP conspired with any of the co-conspirators, nor that it acted as a principal or as a willing participant in the boycott program. Rather, in our view, it operated as it did through fear on the part of its cooks (all black) for their safety, and to avoid the destruction or great impairment of its beneficial program in the county. We are of the view that the able chancellor erred in including it as a judgment defendant, and, as to it, the decree will be reversed and judgment will be rendered here for MAP.
An adequate search of the record reveals to our satisfaction, also, that for insufficient proof, lack of proof, or otherwise, appellees did not establish their case against certain of the defendants, and that including them among those against whom money decree and injunction were awarded *1303 was erroneous. As to them, the cause will be reversed and judgment will be rendered here for them. These are: Priscilla Brooks, Mack Louis Davis, Ethel Graise, Charlie Harris, Albert Jackson, Bessie Newman, D.A. Newman, Henry Otis Preston, Roman Shorter, Leon Tarleton, Alex Dorsey, Ella Dorsey, Bobby Kelly, Beatrice Atlas, Lela Jones, Viola Robinson, Dora Shorter, Rosa Shorter, Annie B. Smith, Alonzo Warner, Bonnie Wells, Eli Brooks, Maggie Clark, Mary Durham, John Eggleston, John Ellis, Rachel Ellis, Mrs. E.J. Jennings, Clarence Lucas, Early Wren, Roosevelt Owens, Delores Smith, Lessie Mae Walls, Ethel Warner, Gussie Pearl Wilson, Willie Wilson, and Ruby Wren.
We next consider the amount of damages awarded by the chancellor to 12 complainants as detailed in the following schedule:

 Loss of
 Earnings Loss of Loss of
 From Interest on Goodwill
 Business Earnings as of
 1966-1972 1966-1972 12/31/72 Penalties TOTAL 
Claiborne Hardware
Company, Inc. $ 10,874 $ 3,313 $ -0- $ 500 $ 14,687
Q.H. McDaniel,
Jr., d/b/a McDaniel
Pharmacy 117,653 21,438 26,460 500 166,051
James E. & George
Hudson, d/b/a
Hudson Brothers'
Piggley Wiggly
Store 174,315 40,882 -0- 500 215,697
Joe Ellis, Mrs. Ben
Mullen, & Miss Ella
Mae Ellis, d/b/a
George Ellis Food
Store 27,101 7,040 -0- 500 34,641
Waddy and Rosalie
Abraham, d/b/a
Jitney Jungle 70,351 12,213 59,153 500 142,217
Norman N. Ellis &
Barbara B. Ellis,
d/b/a Ellis Variety
Store 52,447 4,236 96,633 500 153,816
W.H. Hay, d/b/a OK
Cleaners & Shirt
Laundry 47,889 7,951 26,740 500 83,080
Murad & Mildred
Nasif, d/b/a M&M
Superstore and
Washateria 75,463 16,950 -0- 500 92,913
Port Gibson Lumber
& Supply Co., Inc. 2,500 850 -0- 500 3,850
Charles R. Dobbs,
d/b/a Western Auto
Associate Store 13,994 2,859 -0- 500 17,353
Allen Motor Co., Inc. 2,468 839 -0- 500 3,807
Mrs. Edgar A. McCaa,
d/b/a Town & Country 11,302 2,458 8,327 500 22,587
 ________ ________ ________ ______ ________
 $606,357 $121,029 $217,313 $6,000 $950,699

In addition, the chancellor allowed complainants $300,000 attorneys' fees under section 93-23-85, Mississippi Code Annotated (1972). The award of attorneys' fees was improper because the statute has no *1304 retroactive effect as stated earlier in this opinion.
We also hold that the chancellor was in error in allowing a penalty of $500 to each of the 12 complainants under section 75-21-9, Mississippi Code Annotated (1972), because our restraint of trade statute, section 75-21-1, et seq., Mississippi Code Annotated (1972), has no application to boycotts to achieve political goals.
The chancellor also allowed $121,029 for loss of interest on earnings from 1966 to 1972. Reduced to its essential elements, this is simply an allowance for prejudgment interest and is not permitted under our decisions. In cases involving unliquidated claims for damages, interest can be allowed only from the time of judgment. Alton v. Wood, 300 So.2d 786 (Miss. 1974); McDaniel Bros. Construction Co. v. Jordy, 195 So.2d 922 (Miss. 1967).
The chancellor allowed the 12 complainants $606,357 for loss of earnings from business for the years 1966 to 1972 in the exact dollar amount set forth in Exhibit C-63 entitled, "Special Report Determination of Losses of 12 Business Establishments of Port Gibson, Mississippi, for the years 1966-1972 inclusive." The report was prepared by a firm of CPA's who calculated lost earnings upon the projection by Dr. Paul T. Oliver of the sales lost during the period. Complainants' claim for damages must stand or fall on the accuracy of Dr. Oliver's projection of sales, the underlying data upon which the projection was based, and the application by the accountants to each of the individual businesses.
Dr. Oliver, an associate professor of Economics at the University of Mississippi, testified as an expert and explained the graphs and computations made by him. Dr. Oliver made graphs of sales for the years 1960-65 and projected the sales for each business for the years 1966-72. The graphs depicted a trend line for sales which included an inflation factor of 3.2%. The difference between actual sales and the trend line sales represent his conclusions as to the dollar amount of lost sales for the years 1966-72. The accounting firm of Chapman, Redditt and Grantham then converted lost sales into lost earnings. The accountants explained the basis for converting lost sales into earnings as follows:

BASIS FOR CONVERTING LOST SALES INTO LOST EARNINGS
The percentage of net earnings to gross sales was computed for the six year period 1960-65 and averaged in order to determine the means of converting lost sales into lost earnings for 1966 and the years thereafter.
This percentage represents the average earnings which resulted from sales during a span of normal years without the influence of extraordinary events. The six year period (assuming the business was operating in the six prior years) gives a broad base for an accurate measurement of earnings. Accepted accounting procedures normally call for at least a five-year base in measuring business performance for other purposes.

METHOD OF COMPUTING LOST EARNINGS RESULTING FROM LOST SALES
In computing lost earnings resulting from lost sales, the following major assumptions were made:
(1) Each business should be viewed as a "going concern" which would have continued in business until the present (12/31/72) without a boycott.
(2) Lost sales as computed by Dr. Oliver are the basis for computing lost earnings.
(3) If recovery of sales is made above the trend line in any of the years subsequent to the initial period of loss, total recovery is assumed to have been made. Therefore, any losses of sales subsequent to such recovery are not used in determining lost earnings.
In computing lost earnings resulting from lost sales, the accountants added the gross sales for the base period, 1960-65, and divided this into the total net earnings for the *1305 base period resulting in a percentage representing net earnings. The projected sales with inflation were multiplied by the percentage of net earnings for the base period, the result being projected earnings. Actual earnings for each year, where applicable, were deducted from the projected earnings leaving the earnings lost. This method did not take into consideration any change in the pricing structure or mark-up of goods for sale. We note that gross profit, which is sales less cost of goods sold, decreased in some of the businesses for the period 1966-1972, which leads us to the conclusion that pricing structure of some of the businesses must have changed. When gross profits are reduced net earnings are affected. In order for the computation of lost earnings to be accurate, pricing policies of the businesses involved must be taken into consideration.
The conversion of lost sales into lost earnings was based on Dr. Oliver's calculations of projected sales with inflation. Dr. Oliver was furnished gross sales for each of the businesses for the base period and from this date projected sales with an inflation factor added.
Dr. Oliver candidly admitted that he made no study of all facts relevant to management of the businesses to determine what caused deviations in the base period. He said his study showed that something happened to all 12 businesses almost simultaneously, and if he were to make a study to discover all facts relevant to the fluctuation in gross sales he would consider population growth, disasters, and other things of like nature. He stated he would have included a number of factors other than gross sales and specifically listed: managerial skills, a change in amounts spent on advertising, increases in fixed costs of employees and decline in the availability of money to spend. He said the only factor communicated to him was the boycott and that there might well be other factors. He assumed the impact on sales was caused by the boycott and concluded the boycott, as an economic sanction, had a very dramatic impact, which was its goal. He testified that there was a recession in 1970 and he would not exclude this factor from the trend sales line but did not show that the effect of the recession was included. He stated the recession would have had a dramatic effect on the business of Claiborne Hardware.
One of the problems with the projected sales as calculated by Dr. Oliver is that his calculations failed to take into consideration other facts which we feel would affect the estimate of future sales. (1) Would additional inventory be required to increase sales? (2) Would the individual complainants have the capital necessary to increase the inventory, if necessary? (3) What would the additional capital cost? (4) Would the physical plant of each business be large enough to house an increased inventory or would additions be necessary? (5) Was there any change in management or employees that would affect the volume of sales?
We are of the opinion that these factors, together with the factors mentioned by Dr. Oliver, should be taken into consideration in making an estimate of future sales and that inclusion of all of these factors, or their exclusion with an explanation, if not applicable, is necessary for one attempting to prove lost earnings.
Another problem with the projected sales with inflation is that the gross sales furnished Dr. Oliver for the base period are not consistent. In some gross sales included sales taxes, in other sales taxes were excluded, and in some the inclusion or exclusion of sales tax varied from year to year. We recognize that these variations might have a minimal effect on the projections, but since this case is being reversed for retrial on the issue of damages, the gross sales for the base period should be stated accurately and consistently.
The chancellor also allowed some of the complainants damages for the loss of good will. Good will was defined in the transmittal letter as follows:
... Goodwill is an intangible asset which exists when the actual or expected earnings produced by the assets of a business, exclusive of goodwill, are in excess *1306 of a normal return. Goodwill is generated by any causes of attractive earnings results, such as satisfactory customer relations, location, good employee relations, or "know-how."
The measurement of goodwill is most commonly necessitated when a business is purchased in order to determine a suitable purchase price for the entire business entity and is, therefore, often determined by sheer bargaining.
When a business was sold by a willing buyer to a willing seller, good will is the amount of the purchase price in excess of the tangible assets of the business.
The accountants also explained, in their letter of transmittal, their method of arriving at good will.
(3) Capitalization of Excess Earnings  a percentage return on the average annual value of the tangible assets of a business is determined, using a period of years immediately prior to the valuation date. The amount of the percentage return on tangible assets, thus determined, is deducted from the average earnings of the business for such period and the remainder is considered to be the amount of the average annual earnings from the intangible assets (goodwill) of the business. This amount capitalized at an applicable percentage is the value of the goodwill.
The Capitalization of Excess Earnings Method is considered the most theoretically sound approach by standard accounting texts and is established by the Internal Revenue Service as its accepted guideline in Revenue Ruling 68-609. (Revenue Ruling 68-609 is cited in its entirety in Appendix A of this report). We have, therefore, used this method as the basis for our computation of lost goodwill. A brief summary of our computation follows. For a more technical explanation of our application of this method, see Note 4 on page 8.
Our computation is made as of December 31, 1972, and is based on the earnings of the most recent year. We have basically considered the loss of the asset, goodwill, to the business as of that date as if a valuation were made for the sale of each concern. The reason we have used the most recent year's results rather than an average of prior years, is that in this particular case, a potential purchaser would evaluate the current degree of recovery from prior losses. The use of 3 to 5 years prior earnings average would tend to overstate the amount of goodwill lost and would also result in a loss of goodwill for many businesses which have fully recovered per Dr. Oliver's computations.
Recovery from the boycott impact, according to Dr. Oliver, is evidenced by the crossing of the actual sales line above the "trend line" in any year after the initial boycott impact in 1966. For example, in the case of Hudson on page 34, actual sales exceed "trend line sales" for the year 1972. Therefore, according to Dr. Oliver, Hudson has recovered from the boycott impact, and no loss of goodwill can be determined in his case (See page 39).
Since earnings lost in the year 1972 resulted from unfavorable external events, they were, therefore, a loss of return on the intangible asset of goodwill, (i.e., satisfactory customer relations, etc.). We have, therefore, capitalized the amount of earnings lost in 1972 at 15%, the rate of expected return from intangible assets as set forth in Revenue Ruling 68-609 for businesses with a relatively small risk factor and stable earnings. The resulting amount is the lost goodwill as measured at 12/31/72. (See the computation for McDaniel on page 30).
As we understand the exhibits and testimony of the accountants they did not employ the method set forth in their transmittal letter. We fail to find that the accountants computed the percentage return on the tangible assets of the businesses involved in this case and deducted this amount from net earnings. We also note that Revenue Ruling 68-609 requires sole proprietorships or partnerships to deduct from earnings a reasonable amount for services performed *1307 by the owners or partners engaged in the business. This was not done.
Failure to compute good will properly resulted in an overvaluation of good will. For example, Barbara B. Ellis and Norman N. Ellis, doing business as Ellis Variety Store, were awarded $96,633 for loss of good will. The income tax returns for these complainants show a beginning inventory for the years 1960-68 as follows:

 1960 $7,058.27
 1961 4,774.15
 1962 3,174.08
 1963 4,595.96
 1964 6,146.34
 1965 7,659.26
 1966 8,479.32
 1967 6,794.19
 1968 9,998.93

The tax return for 1968 also showed other tangible assets used in the business amounted to $3,000. Adding these tangible assets to the beginning inventory for 1968 makes a total of $12,998.93 of tangible assets used in the business. An allowance of $96,633 damages for loss of good will is a gross overvaluation of good will.
We reverse the allowance for loss of good will to each complainant and remand for further evidence on loss of good will. On retrial the court should determine whether a business should be permitted to recover profits on lost sales plus loss of good will. It appears to us there is a strong probability that allowing recovery of profits on lost sales plus loss of good will would pyramid damages and amount to double recovery. We express no opinion on this question but expert testimony should deal with the question on retrial.
We are satisfied that complainants suffered some damages resulting from the boycott but are of the opinion that the amount allowed was excessive under the evidence presented.
We hold the chancellor erred in failing to reduce the award of damages to complainants McDaniel, Norman N. Ellis and Barbara B. Ellis for the amount earned by them while they were out of business. Southern Christian Leadership Conference, Inc. v. A.G. Corp., 241 So.2d 619 (Miss. 1970).
Complainants were under a duty to mitigate damages and any award made to complainants shall be reduced by their earnings.
AFFIRMED IN PART AND REVERSED AND RENDERED IN PART ON LIABILITY; REVERSED AND RENDERED IN PART ON DAMAGES; REVERSED AND REMANDED IN PART ON DAMAGES.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, LEE and BOWLING, JJ., concur.
NOTES
[1] Whitney v. State, 205 So.2d 284 (Miss. 1967).